**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CITIZENS INSURANCE COMPANY
OF AMERICA,

      Plaintiff/Counter-Defendant,           Case No. 03-75031

v.                                     Hon. Gerald E. Rosen

PITNEY BOWES SOFTWARE SYSTEMS
EMPLOYEE MEDICAL & HEATH CARE
SERVICE CORP.,

      Defendant/Counter-Plaintiff.
_____/

**OPINION AND ORDER REGARDING**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    March 2, 2007

      PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I.  INTRODUCTION

In this case, Plaintiff Citizens Insurance Company of America ("Citizens") seeks a

declaration that the coverage provided to non-party Gordon Shenkus under the Defendant

health care plan, the Pitney Bowes Software Systems Employee Medical & Health Care

Service Corp. (the "Pitney Bowes Plan"), is primary to the coverage provided to Mr.

Shenkus under the terms of a no-fault automobile insurance policy issued by Citizens.

Citizens also seeks reimbursement of over $228,000 in medical expenses that it has paid

for the benefit of Mr. Shenkus, but that, in its view, should have been paid by the Pitney

Bowes Plan.  The Pitney Bowes Plan, in turn, has filed a counterclaim in which it seeks

(i) a declaration that the Citizens policy, and not the Plan, is primarily responsible for

paying Mr. Shenkus's medical expenses, and (ii) reimbursement of over $30,000 in

medical expenses that it paid under a mistaken belief that it was obligated to do so.  This

Court's subject matter jurisdiction rests upon the assertion of claims (i) that implicate the

obligations of an employee benefit plan, the Pitney Bowes Plan, which is governed by the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,*

and (ii) that are governed by the federal common law developed by the courts to address

coordination-of-benefits disputes of the sort presented here.  See 28 U.S.C. § 1331; see

also Auto Owners Insurance Co. v. Thorn Apple Valley, Inc., 31 F.3d 371, 374 (6th Cir.

1994).

    Through the present cross-motions, each party seeks summary judgment in its

favor concerning the proper interpretation and interplay of the coordination-of-benefits

("COB") provisions in the Citizens automobile insurance policy and the Pitney Bowes

Plan.  The parties agree as to all of the pertinent facts and much of the governing law, and

they largely agree as to how the COB provisions in the Citizens policy and the Pitney

Bowes Plan should be construed.  Their principal point of disagreement is a narrow one:

whether the terms of the Pitney Bowes Plan and its summary plan description ("SPD")

are in conflict regarding coordination of benefits, and, if so, which terms should prevail.

Citizens seeks to apply the purportedly more favorable terms of the SPD, while the Pitney

2

Bowes Plan insists (i) that the SPD and the Plan are not in conflict, and (ii) that, even if they were, the terms of the Plan must prevail.

These cross-motions have been fully briefed by both parties. Having reviewed the parties' briefs, the accompanying exhibits, and the record as a whole, the Court finds that the relevant facts and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' motions "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings.

## II.  FACTUAL BACKGROUND

This case concerns the coverage provided to non-party Gordon Shenkus under a no-fault automobile insurance policy issued to him by Plaintiff Citizens Insurance Company of America ("Citizens") and a health benefit plan, the Defendant Pitney Bowes Software Systems Employee Medical & Health Care Service Corp. (the "Pitney Bowes Plan," or "Plan"), offered by his employer, Pitney Bowes. Mr. Shenkus has participated in the Plan since he began his employment with Pitney Bowes in 1959, and has been covered by Citizens automobile insurance policies since 1992.

On or around February 4, 2002, Mr. Shenkus sustained serious injuries in an automobile accident. From approximately March through September of 2002, Citizens paid a total of $228,339.84 in medical expenses incurred by Mr. Shenkus as a result of this accident. Throughout this time, however, Citizens advised Mr. Shenkus's medical

3

service providers that the Citizens policy provided only excess coverage to Mr. Shenkus, and that the Pitney Bowes Plan provided primary coverage. As a result, at least some claims for reimbursement of Mr. Shenkus's medical expenses were submitted to the Plan's claims administrator, UnitedHealthcare Corporation ("UHC"), and UHC paid benefits totaling $33,469.50.

**A.    The Relevant Terms of the Citizens Automobile Insurance Policy**

As noted earlier, the sole point of contention in this case concerns the proper interpretation and interplay of the coordination-of-benefits ("COB") provisions set forth in the Citizens no-fault automobile insurance policy issued to Mr. Shenkus and the Plan offered by his employer. As to the former, the Citizens policy in effect at the time of Mr. Shenkus's injuries provided in pertinent part:

We do not provide Personal Injury Protection Coverage for:

1.    Medical expenses for you or any "family member":

    a.    To the extent that similar benefits are paid, payable, or required to be paid, under any individual, blanket or group accident or disability insurance, service, benefit, reimbursement or salary continuance plan (excluding Medicare benefits provided by the federal government); and

    b.    To the extent similar benefits are available to you or any "family member" and for the reason those benefits are foregone, waived, ignored, underutilized or otherwise not accessed; and

    c.    if Excess Benefits for medical expense is indicated in the Declarations.

If you elect Excess Coverage for medical expenses, any amount

4

> payable shall be subject to a $300 deductible.  However, any amount payable as medical expenses by any source, other than under this policy, shall be credited toward satisfying this deductible requirement.

(Stipulated Record, Ex. C., Citizens Policy at 16.)  The accompanying declarations indicate that Mr. Shenkus elected excess coverage within the meaning of this provision.

**B.      The Relevant Terms of the Pitney Bowes Plan and Its SPD**

The Pitney Bowes Plan addresses the issue of coordination of benefits in the summary plan description ("SPD") and in the underlying Plan document.  First, the portion of the SPD that describes the Pitney Bowes medical plan[1] includes the following discussion of coordination of benefits:

*Coordination of Benefits*

Pitney Bowes coordinates your medical benefits with any benefits you or a covered dependent receive from another plan.  This process prevents duplicate payments for the same medical expenses by more than one plan.

If you and/or your dependents are covered by a Pitney Bowes medical plan and another plan, benefits are coordinated based on which plan is "primary" and which plan is "secondary."

The primary plan pays benefits first.  The secondary plan pays benefits according to its coordination of benefits provision.  When Pitney Bowes is the secondary plan, it pays the difference, if any, between what the other company's plan paid and what our plan would have paid if it were providing the only coverage.

---

[1]Although the SPD document is quite lengthy, spanning over 200 pages, it addresses a number of benefits offered to Pitney Bowes employees, such as retirement, stock purchase, and severance pay.  The relevant portion of the SPD, addressing the Pitney Bowes medical plan, comprises about 40 pages of the overall SPD.

This "coordination of benefits" applies to any group insurance or other group coverage (whether insured or not); coverage under a government program, such as Medicare; and no-fault auto insurance.  It doesn't apply to any benefits paid to you from a personal policy.

How do you know which plan is primary?  If the other plan doesn't coordinate benefits, it's considered the primary plan.  If both plans coordinate benefits, these guidelines apply:

•       The plan covering the patient directly pays first and the other plan is secondary.  For example, Pitney Bowes is primary for you but secondary for your spouse if he or she has coverage through his or her employer.

* * * *

If none of these guidelines apply to your situation, the primary plan is the plan covering the patient for the longest period of time.

(Stipulated Record, Ex. B, SPD at II-50-51, PB225-26.)[2]

Apart from this discussion of coordination of benefits in the SPD, the underlying

Pitney Bowes Plan document states as follows in a section entitled "General Exclusions":

In addition to the exclusions set forth elsewhere in the Plan, the services and supplies listed in this Section 16 shall not be considered Covered Services or Supplies under the Plan . . . .

*16.1    Services or Supplies Covered Elsewhere*

Services or supplies covered under any federal or state "no-fault" motor vehicle insurance provision that relates to medical treatment or other mandated insurance, regardless of whether the Covered Person properly asserts his or her rights under the motor vehicle insurance contract.

_____

[2]The omitted guidelines concern dependent children and are not relevant here.

6

(Stipulated Record, Ex. A, Plan at 67, PB77.)[3]

Finally, the SPD addresses the possibility of conflict between its language and the provisions of the underlying Plan document:

> It's important to note that every effort has been made to ensure the accuracy of the information provided in this handbook. However, many of the plans, programs, and policies discussed herein are governed by official plan documents and administrative practices. If there is any conflict between the information presented in this handbook and the official plan documents and administrative practices, the official plan documents and administrative practices will govern.

(SPD at I-1, PB164.)

## III.  ANALYSIS

### A.    The Standards Governing the Parties' Cross-Motions

Through the present cross-motions, each party seeks summary judgment in its favor as to its obligation — or, more accurately, claimed lack thereof — to pay the medical expenses incurred by Gordon Shenkus as a result of his February 4, 2002 automobile accident. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In this case, the parties agree as to the pertinent facts, and disagree only as to the purely legal questions (i) whether the terms of the Pitney Bowes Plan and its SPD are in

---

[3]The Plan also includes a "Coordination of Benefits" section that reads similarly to, but more detailed than, the discussion of this topic in the SPD. (See Plan at 77-79, PB87-89.)

conflict regarding coordination of benefits, and (ii) if so, whether the language of the Plan or the SPD is controlling.  As the parties agree, these issues of law are amenable to resolution through a Rule 56 motion for summary judgment.

**B.     The Law Governing the Parties' Coordination-of-Benefits Dispute**

Just as the parties agree on the relevant facts, they largely agree as to the substantive legal standards that govern the Court's resolution of their dispute over coordination of benefits.  In particular, both parties recognize that <u>Auto Owners Insurance Co. v. Thorn Apple Valley, Inc.</u>, 31 F.3d 371 (6th Cir. 1994), and its progeny provide the legal framework for this Court's decision in this case.

In <u>Thorn Apple Valley</u>, 31 F.3d at 373, the Sixth Circuit confronted a case in which the terms of an ERISA health benefit plan were "in direct conflict" with a coordination-of-benefits clause in a no-fault automobile insurance policy.  Specifically, "both the plan and the policy purported to make the other primarily liable for payment of medical expenses." 31 F.3d at 373.  The Court first determined that it had jurisdiction over this coordination-of-benefits dispute, and that ERISA preempted a Michigan no-fault statute, Mich. Comp. Laws § 500.3109a, that had been construed by the Michigan courts as imposing primary liability on a health benefit plan in the case of a conflict with a no-fault auto insurance policy.  31 F.3d at 374.[4]  The Sixth Circuit then held, as a matter of federal common law, that the ERISA plan's COB clause must prevail over the conflicting

---

[4]It is similarly evident in this case that this Michigan statute is preempted, and Citizens does not contend otherwise.

8

COB provision in the no-fault auto insurance policy.  The Court reasoned that this result
was dictated by a congressional intent "to guard qualified benefit plans from claims, such
as that advanced by [the plaintiff no-fault insurer], which have been expressly disavowed
by the plans."  31 F.3d at 375.

As recognized in the subsequent case law, and as the parties here acknowledge, the
ruling in Thorn Apple Valley applies only where the terms of an ERISA plan and a non-
ERISA insurance policy are in direct conflict regarding coordination of benefits, and
where the ERISA plan expressly disavows its primary status in the event of overlapping
coverage.  In Great-West Life & Annuity Insurance Co. v. Allstate Insurance Co., 202
F.3d 897, 900 (6th Cir. 2000), for example, the Court found that Thorn Apple Valley was
not controlling, where the two COB provisions in that case "may conflict to some degree,
but are not irreconcilable."[5]  Similarly, in Citizens Insurance Co. v. MidMichigan Health
ConnectCare Network Plan, 449 F.3d 688, 691, 696-97 (6th Cir. 2006), the Court again
concluded that Thorn Apple Valley was not applicable, where the parties themselves
agreed that there was "no conflict in the coordination of benefits clauses between the plan
and the [no-fault auto insurance] policy," and where the policy excluded coverage for
medical expenses covered by a benefit plan but the plan "did not expressly disavow
coverage for medical benefits otherwise payable under a no-fault policy."

_____

[5]The Court nonetheless affirmed the district court's ruling in favor of the ERISA plan,
where the plan and the no-fault auto insurance policy, by their own terms, dictated that the no-
fault policy's coverage was primary.  See Great West Life & Annuity, 202 F.3d at 901.

9

Against this legal backdrop, the parties' dispute here is a narrow one.  Citizens acknowledges that the COB provision in its no-fault auto insurance policy directly conflicts with the clause in the Pitney Bowes Plan that excludes coverage for medical expenses that are recoverable under a no-fault motor vehicle insurance policy.  Citizens further concedes, as it must, that under the rule of <u>Thorn Apple Valley</u>, the provision in the Pitney Bowes Plan would govern over the contrary COB clause in its own policy.  Nonetheless, Citizens maintains that the exclusion in the Pitney Bowes Plan is overcome by the purportedly contrary coordination-of-benefits language in the Plan's SPD, which Citizens construes as dictating that the Plan's coverage is primary.

The Plan, for its part, seemingly concedes that the COB clause in the Citizens policy, standing alone, would exclude coverage for medical expenses that are payable under a health plan.[6]  The Plan further appears to acknowledge that the SPD's discussion of coordination of benefits, read in isolation, lends a degree of support to Citizens's position.  Nevertheless, it insists (i) that this SPD language, viewed in its proper context, does not conflict with the exclusion found in the Plan itself, and (ii) that, even if there is a conflict between the SPD and the underlying Plan document, the latter must prevail.  Accordingly, the Court turns to these issues.

**C.    The Guidelines in the Summary Plan Description Regarding Coordination of Benefits Prevail over the Conflicting Exclusion Found in the Underlying Plan Document.**

---

[6]It would be difficult for the Plan to contend otherwise, in light of the Sixth Circuit's interpretation of an identical policy provision in <u>Citizens Insurance</u>, 449 F.3d at 691-97.

10

As explained, the parties here are in agreement as to the proper construction of the coordination-of-benefits clause in the Citizens policy — namely, that this provision, standing alone, is meant to provide excess coverage, paying medical expenses only to the extent that they are not recoverable under another policy or a benefit plan.  See Citizens Insurance, 449 F.3d at 691-97 (construing an identical provision in this manner).  Consequently, the parties' dispute in this case turns solely upon the proper interpretation of the Pitney Bowes Plan.  The Sixth Circuit has instructed, and the parties here agree, that this issue must be resolved by resort to federal common law.  See Citizens Insurance, 449 F.3d at 691; Regents of University of Michigan v. Employees of Agency Rent-A-Car Hospital Ass'n, 122 F.3d 336, 339 (6th Cir. 1997); Thorn Apple Valley, 31 F.3d at 374.  Moreover, this issue of plan interpretation is a purely legal question that the Court considers *de novo.*  See Citizens Insurance, 449 F.3d at 691.[7]

---

[7]Citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989), the Plan argues that its own interpretation is entitled to deference and should be subject to only arbitrary and capricious review, where the Plan administrator has been granted the "full discretionary power to administer the Plan in all of its details," as well as the authority "[t]o construe and interpret the provisions of the Plan . . . and to remedy ambiguities, inconsistencies or omissions."  (Stipulated Record, Ex. A, Plan at 88-89, PB98-99.)  Notably, while the Plan appeals here to the standards applied in cases brought under 29 U.S.C. § 1132(a)(1)(B) challenging the denial of ERISA benefits, it then contends, as discussed below, that the Court should ***not*** apply another rule derived from this same line of cases — namely, that the language of an SPD should control over contrary language in an underlying plan document.

In any event, the Court is reasonably confident that the principal issue of plan interpretation in this case should be determined *de novo,* and without deference to the position taken by the Plan and its administrator.  The crux of the parties' dispute here, after all, is not as to the proper meaning of one or another provision found in the Plan or its SPD, but rather concerns the question of how to resolve a purported conflict between the Plan and the SPD.  Federal common law dictates the resolution of this question, and it plainly is the province of this

11

### 1.       The Summary Plan Description Conflicts with the Plan Regarding Coordination of Benefits with a No-Fault Auto Insurance Policy.

Two provisions are at issue here, one in the Plan document and one in its SPD.

The former provision, found in a section of the Plan entitled "General Exclusions," states

that the Plan's definition of "Covered Services or Supplies" does not encompass

"[s]ervices or supplies covered under any federal or state 'no-fault' motor vehicle

insurance provision that relates to medical treatment or other mandated insurance."

(Stipulated Record, Ex. A, Plan at 67, PB77.)[8]  Although the Plan objects to this

characterization, this provision is aptly categorized as an "escape" clause, as it "provides

that there shall be no liability if the risk is covered by other insurance."  Regents of

University of Michigan, 122 F.3d at 340.  As noted earlier, Citizens concedes that this

escape clause, viewed in isolation, would directly conflict with the COB clause in its own

---

Court, and not the Plan, to say what this law is.

To be sure, the Plan denies the existence of a conflict between the SPD and the underlying Plan document, and the Plan's harmonizing construction perhaps is entitled to a degree of deference here.  Indeed, the Plan correctly points to a  prior ruling in this District in which the Court applied the arbitrary and capricious standard, albeit without discussion, in resolving a dispute between competing COB clauses in a no-fault auto insurance policy and an ERISA plan.  See Frankenmuth Mutual Insurance Co. v. Wal-Mart Associates' Health & Welfare Plan, 182 F. Supp.2d 612, 620-21 (E.D. Mich. 2002) (Hood, J.).  In the end, however, this Court need not decide whether the Plan's harmonizing construction is subject to only arbitrary and capricious review, because a plan interpretation which is not "reasonable" cannot survive scrutiny even under this deferential standard.  See Wells v. United States Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1249 (6th Cir. 1991) (quoting Firestone, 489 U.S. at 111, 109 S. Ct. at 954).  As discussed below, the interpretation offered by the Plan here fails to satisfy this standard.

[8]All are agreed that the Plan's reference to "services or supplies" encompasses the medical care provided to Mr. Shenkus.

12

no-fault policy, such that the Citizens policy would bear primary liability under the rule of Thorn Apple Valley.

The first question, then, is whether this Plan provision is inconsistent with the discussion of coordination of benefits found in the Plan's SPD.  As set forth in full above, the SPD first describes the general concept of coordination of benefits, then lists the types of other plans with which the Plan's benefits are coordinated, and finally sets forth the guidelines that will be applied in determining which plan is primary and which is secondary.  Among the types of plans to which "'coordination of benefits' applies," the SPD expressly lists "no-fault auto insurance."  (Stipulated Record, Ex. B, SPD at II-50, PB225.)  It is evident, then, that this portion of the SPD alerts participants that their Plan benefits will be coordinated with their coverage under a no-fault auto insurance policy.[9]

This leads to the obvious question, which the SPD proceeds to both ask and answer — namely, "[h]ow do you know which plan is primary?"  (SPD at II-51, PB226.) In cases where, as here, "both plans coordinate benefits," the SPD sets forth the guidelines that will be used to determine which plan is primary.  (Id.)  As Citizens points

---

[9]As the Plan points out, immediately after listing "no-fault auto insurance" as among the types of plans or policies to which coordination of benefits will apply, the SPD states that the Plan's benefits are ***not*** coordinated with "any benefits paid to you from a personal policy."  (SPD at II-50, PB225.)  Yet, it surely is possible — as is, in fact, the case here — that a no-fault auto insurance policy may be a "personal policy."  To the extent that the SPD is inconsistent on this point, its specific reference to "no-fault auto insurance" as subject to coordination of benefits must prevail over its more general exclusion of "benefits paid . . . from a personal policy."  In addition, and as discussed at greater length below, any ambiguity on this point must be resolved against the Plan as the drafter of the SPD.  See Regents of University of Michigan, 122 F.3d at 340.

out, and the Plan does not dispute, none of the SPD's four guidelines is helpful in determining whether the Citizens policy or the Plan is the primary source of coverage for Mr. Shenkus's medical expenses.  This leaves only the default rule — namely, that "[i]f none of these guidelines apply to your situation, the primary plan is the plan covering the patient for the longest period of time."  (Id.)  It is uncontested that the Plan's coverage of Mr. Shenkus dates back to 1959, while he first was covered by a Citizens auto insurance policy in 1992.  Under the default rule, then, the Plan would be primary and the Citizens policy secondary.[10]

It is untenable to suggest, as the Plan does, that this portion of the SPD does not conflict with the "escape" clause found in the Plan itself.  In the Plan's view, the SPD does no more than "explain[] to participants and beneficiaries that their benefits under the Plan are coordinated with coverage available from other sources to avoid duplicate payments, including coverage under no-fault automobile insurance."  (Pitney Bowes Opposition Br. at 11.)  Yet, while the first several paragraphs of the SPD's coordination-of-benefits discussion do precisely that, the *remainder* of this section consists of explicit guidelines for determining "which plan is primary."  By simply applying these guidelines to the circumstances presented here, one is led ineluctably to the conclusion that the Plan

---

[10]To the extent that the SPD could be viewed as less than clear in its reference to "the plan covering the patient for the longest period of time," the corresponding language of the underlying Plan clarifies that "the plan that has covered the person for the longer period of time shall be the primary plan, and the plan that has covered the person for the shorter period of time shall be the secondary plan."  (Plan at 77, PB87.)  Thus, the parties agree that this default rule, if applicable, would result in the Plan providing primary coverage.

14

is primary because it has provided coverage to Mr. Shenkus for the longest period of

time.  Nothing in the remainder of the SPD would undermine this conclusion in any way,

and the Plan does not contend otherwise.

Nor does it matter here that, as the Plan points out, an SPD is meant to merely

summarize the more detailed provisions of an underlying plan document.  See Helwig v.

Kelsey-Hayes Co., 93 F.3d 243, 249-50 (6th Cir. 1996) (discussing the statutory

requirements that SPDs must satisfy and the congressional intent in mandating SPDs).

With regard to all of the pertinent aspects of coordination of benefits — in particular, the

other types of plans and policies to which it applies, and the rules for determining priority

among these plans — the discussion in the SPD here does not omit *any* significant details

that can only be discovered by resort to the Plan itself.  Notwithstanding the Plan's

assertions, then, this simply is not a case where the SPD is vague or ambiguous but the

underlying plan documents resolve any lingering uncertainty.  See, e.g., Lake v.

Metropolitan Life Ins. Co., 73 F.3d 1372, 1379 (6th Cir. 1996).  To the contrary, the

SPD's description of the applicable COB guidelines is materially indistinguishable from

the underlying Plan provisions addressing this topic.  (Compare SPD at II-51, PB226,

with Plan at 77, PB87.)  Thus, whether one were to resolve the COB dispute here by

resort to the SPD or by reference to the Plan's COB provisions, the outcome would be the

same:  the Plan's coverage would be primary because it "has covered [Mr. Shenkus] for

the longer period of time."  (Plan at 77, PB87.)

The conflict here, then, is not a product of any difficulty or inartfulness in

15

translating the Plan's detailed terms into a more general and easily understandable SPD. The dispute in this case, rather, arises from an exclusion in the Plan itself that purports to **trump** the usual COB guidelines, as uniformly described in the SPD and Plan alike, in the specific circumstance where "[s]ervices or supplies [are] covered under any federal or state 'no-fault' motor vehicle insurance provision."  (Plan at 67, PB77.)  So far as the Court can discern — and the Plan does not suggest otherwise — the SPD is utterly silent as to the existence of any such exception to the usual guidelines for determining which plan is primary and which is secondary.  This is not a lack of detail, but a lack of any mention whatsoever of the Plan's escape clause that precludes coverage for medical expenses that are recoverable under a no-fault motor vehicle insurance policy.  Indeed, the SPD affirmatively indicates that there is no such escape clause, as it explicitly refers to "no-fault auto insurance" as subject to coordination of benefits, and then immediately lists "the[] guidelines" that will govern COB determinations, whether involving no-fault insurance or any other eligible source of benefits.  This reference to no-fault auto insurance would be entirely superfluous if, in fact, the benefits from this source were subject to an altogether different COB rule — *i.e.,* that the no-fault policy is always primary, as indicated in the Plan's escape clause.

Under comparable circumstances, where an SPD entirely omits a requirement or limitation that is set forth in the underlying plan document, the courts have routinely concluded that the SPD conflicts with the plan.  See, e.g., Helwig, 93 F.3d at 249-50; Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 111 (2d Cir. 2003); Burstein v.

16

<u>Retirement Account Plan for Employees of Allegheny Health Education & Research</u> <u>Foundation</u>, 334 F.3d 365, 375-76, 379-80 (3d Cir. 2003).  As the Sixth Circuit has explained, an SPD conflicts with its underlying plan documents where it "mislead[s] employees into thinking that they have a right to benefits when other documents obliquely negate those rights."  <u>Helwig</u>, 93 F.3d at 250.  Such is the case here, where the SPD states that coordination of benefits between the Plan and a no-fault auto insurance policy is governed by several guidelines and a default rule, but the Plan's escape clause provides that the no-fault policy is ***always*** primary.  Accordingly, the Court readily concludes that the SPD in this case directly conflicts with the underlying Plan as to the rules that apply to coordination of benefits between the Plan and a no-fault auto insurance policy.

> **2.     Here, as in Other Circumstances, the Language of the SPD Prevails over the Conflicting Escape Clause in the Plan Itself.**

Having rejected the Plan's contention that the SPD and underlying Plan document are not in conflict, the Court next must determine how to reconcile this conflict.  In the context of claims for ERISA benefits brought under 29 U.S.C. § 1132(a)(1)(B), the Sixth Circuit and a number of other courts have uniformly held that the language of an SPD controls over a conflicting provision in the underlying plan documents.  <u>See</u> <u>Helwig</u>, 93 F.3d at 249 ("[T]his Court has held quite clearly that promises made in SPDs are binding on the employer regardless of conflicting language in a master agreement."); <u>Edwards v.</u> <u>State Farm Mutual Automobile Ins. Co.</u>, 851 F.2d 134, 136-37 (6th Cir. 1988); <u>see also</u>

17

Burke, 336 F.3d at 110; Burstein, 334 F.3d at 378; Hansen v. Continental Ins. Co., 940 F.2d 971, 981-82 (5th Cir. 1991); McKnight v. Southern Life & Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir. 1985).  The Plan argues that this rule should not carry over to the present context, where at least some of the reasoning employed by the courts in deriving this principle is inapposite to a COB dispute between an insurer and an ERISA plan.  As explained below, the Court concludes that the usual rule should govern despite these somewhat different circumstances.

As the parties recognize, and as the Court's own research has confirmed, the specific question presented here apparently is one of first impression, and has not yet been addressed in a published opinion.  In particular, while the courts have consistently held that statements in an SPD control over conflicting provisions in an underlying plan document, each such decision, at least so far as the Court has been able to discern, arose the context of a claim for ERISA benefits brought under 29 U.S.C. § 1132(a)(1)(B).  Under these circumstances, the Plan asserts that Citizens has failed to provide any authority for the purportedly "extraordinary proposition" that the rule applied in such cases as Edwards and Helwig, supra, "should be extended to someone other than a participant or beneficiary."  (Plan's Summary Judgment Motion, Br. in Support at 12.)  Yet, as Citizens properly points out, neither has any court *declined* to apply this rule outside the context of a claim for benefits.  The Plan's astonishment aside, then, this Court certainly is not foreclosed from applying the usual rule to a somewhat different set of facts and circumstances.

18

Accordingly, the Court turns to the case law for indications whether this usual rule should be strictly limited to the context in which it was initially adopted and has been applied to date.  The leading Sixth Circuit case on the subject is Edwards, supra, 851 F.2d at 135, in which an SPD and an underlying plan conflicted as to whether time spent on sick leave counted toward an employee's years of service for purposes of determining eligibility for disability benefits.  The Court observed that the SPD alone was distributed to employees, "in lieu of providing . . . the entire text of the Plan," and that the SPD was "obviously misleading" in its representation that time spent on sick leave would be credited toward an employee's years of service.  Edwards, 851 F.2d at 135-36.  Under these circumstances, the Court found that the plan administrator "should have realized that the explicit language of the Summary could or would have caused [the plaintiff employee] and similarly situated lay employees to rely upon [the drafting insurer's] inadvert[e]nt misrepresentation to their detriment."  851 F.2d at 136.

Citing the statutory requirements for SPDs, the corresponding legislative history, and the relevant case law, the Court reasoned that it would be "grossly unfair" to employees to mandate the publication and distribution of "a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan."  851 F.2d at 136 (internal quotation marks and citations omitted).  In order to guard against such unfairness, and to permit employees to reasonably rely upon the SPDs provided to them in lieu of the underlying plan documents, the Court held that statements in an SPD control over

19

conflicting plan provisions.  851 F.2d at 136.  Notably, however, the Court declined to impose a requirement that "a claimant who has been misled by summary descriptions must prove detrimental reliance," where to do so would "undermine the legislative command" against "misleading summary descriptions."  851 F.2d at 137.

The Sixth Circuit's more recent decision in Helwig, supra, features similar reasoning.  The Court first reviewed the ruling in Edwards, observing that it "recognized the impact that . . . summary descriptions have on lay beneficiaries," and that it "was also based on the statutory language" governing SPDs.  Helwig, 93 F.3d at 247-48.  The Court then found that the Edwards rule applied with full force in the case before it, where the SPDs provided to the plaintiff retirees had promised lifetime health benefits at no cost, but the master plan agreements reserved the employer's right to modify or terminate these benefits.  "Following the same reasoning we used in *Edwards*," the Court concluded "that it would make no sense for Congress to require employers to provide clear, simple, complete descriptions of benefit plans if the employee were expected to also know and understand every clause in the voluminous, complex, and legalistic document the SPD was intended to accurately describe."  93 F.3d at 249-50.

In light of the Sixth Circuit's repeated references to an employee's right to reasonably rely on the statements found in an SPD, the Plan asserts in this case that the rule applied in Edwards and Helwig is most accurately characterized as an "estoppel doctrine" that "protects only the interests of participants and beneficiaries of employee benefit plans."  (Plan's Opposition to Citizens' Motion at 12.)  In the Plan's view,

20

Citizens cannot claim any similar entitlement to rely on the SPD provided to Plan participants.  Rather, this case involves a purely contractual dispute between two presumably sophisticated entities standing on roughly equal footing, so that "the Sixth Circuit's equitable estoppel doctrine has no application to this case."  (Id. at 14.)

The Plan's proposed reading of Edwards and Helwig, however, ignores both the legal setting of those cases and a portion of the Sixth Circuit's reasoning.  As to the former, there is an important distinction between cases such as Edwards and Helwig, involving claims for benefits under § 1132(a)(1)(B), and cases such as Sprague v. General Motors Corp., 133 F.3d 388, 403-04 (6th Cir. 1998), and Armistead v. Vernitron Corp., 944 F.2d 1287, 1299-1300 (6th Cir. 1991), in which the Sixth Circuit explicitly addressed the availability of and limits to an equitable estoppel theory in ERISA cases.  The doctrine of equitable estoppel, where applicable, "precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel."  Armistead, 944 F.2d at 1299.  Consequently, "[w]hen a party is estopped from asserting a right in a written plan, the plan as enforced is not the same as the plan as written."  944 F.2d at 1300.

The decisions in Edwards and Helwig cannot properly be read as resting on this doctrine of equitable estoppel.  In particular, the Sixth Circuit did not hold in those cases that the plan administrators were precluded from exercising contractual rights that they otherwise would have enjoyed under the governing plan documents.  Rather, the Court found that the plans in those cases conferred no such rights in the first instance, in light of

21

the conflicting provisions in the SPDs and the underlying plan documents.  The plans in those cases, as in all actions for benefits under § 1132(a)(1)(B), were enforced as written — the question before the Court was how to *construe* the plans, where a provision in one of the governing documents (the SPD) conflicted with a provision in another (the underlying plan).  This is analytically distinct from the question whether a plan sponsor or administrator should be *estopped* from enforcing the terms of the plan because of conduct or representations extrinsic to the plan.  Indeed, the decision in <u>Sprague</u> makes this distinction clear, where the Court first addressed a breach-of-contract theory — including an appeal to the <u>Edwards</u> rule — and then separately considered a claim of equitable estoppel.  See <u>Sprague</u>, 133 F.3d at 399-402, 403-04.

To be sure, the Sixth Circuit's decisions in <u>Edwards</u> and <u>Helwig</u> rest in part upon the same notion of "reasonable reliance" that is an element of a claim of equitable estoppel.  See <u>Sprague</u>, 133 F.3d at 403 (enumerating this and the other elements of an equitable estoppel claim).  Yet, the Court *also* found support for its decisions in the statutory provisions governing SPDs and the corresponding legislative history.  See <u>Helwig</u>, 93 F.3d at 247-50; <u>Edwards</u>, 851 F.2d at 136.  Indeed, it was precisely because of the statutory duty of accuracy in SPDs that the Court in <u>Edwards</u> declined to require that employees must prove detrimental reliance in order to take advantage of the rule adopted in that case.  See <u>Edwards</u>, 851 F.2d at 137; <u>see also</u> <u>Burstein</u>, 334 F.3d at 381 ("[J]ust as a court's enforcement of a contract generally does not require proof that the parties to the contract actually read, and therefore relied upon, the particular terms of the contract, we

22

are persuaded that enforcement of an SPD's terms under a claim for plan benefits *does not* require a showing of reliance."); <u>Feifer v. Prudential Insurance Co.</u>, 306 F.3d 1202, 1213 (2d Cir. 2002) (observing that the absence of a "reliance or prejudice requirement is consistent with the principle that an action under ERISA to enforce plan terms sounds in contract, and a plaintiff generally need not show equitable factors such as reliance or prejudice to enforce contractual terms"). Accordingly, this Court reads <u>Edwards</u> and <u>Helwig</u> as endorsing a rule of plan construction that is equally applicable to the identical interpretative dilemma presented in this case — namely, how to resolve a conflict between the language of an SPD and provisions in an underlying plan document. Under <u>Edwards</u> and <u>Helwig</u>, the SPD is controlling.

In any event, the Plan should not be too quick to dismiss any possible element of reliance here. Under Michigan law, Citizens was required to offer to Mr. Shenkus, "at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured." Mich. Comp. Laws 500.3109a. The Sixth Circuit recently described this feature of the Michigan No-Fault Insurance Act ("MNFIA"), Mich. Comp. Laws § 500.3101 *et seq.*:

> Because the MNFIA requires automobile owners to maintain no-fault insurance, many Michigan car owners have coverage from two insurance policies. That is, they have health insurance and/or worker's compensation coverage in addition to a no-fault automobile insurance policy. To ease the expense of requiring drivers to maintain two duplicative insurance policies, MNFIA mandates that insurance companies offer coordinated benefits plans. Mich. Comp. Laws § 500.3109a; *see Smith v. Physicians Health Plan, Inc.,* 444 Mich. 743, 514 N.W.2d 150 (1994). Under a coordinated benefits plan, a no-fault insurer must offer insurance at

23

> reduced premiums to persons with health care or worker's compensation coverage that duplicates the no-fault insurance policy's coverage. Mich. Comp. Laws § 500.3109a. The insured may then only recover from a no-fault insurance company to the extent that his or her reasonably necessary medical expenses and lost income have not been compensated through the primary health or worker's compensation plan. *Auto-Club Ins. Ass'n v. New York Life Ins. Co.,* 440 Mich. 126, 485 N.W.2d 695, 698 (1992).

Shields v. Government Employees Hospital Ass'n, 450 F.3d 643, 647 (6th Cir. 2006). This Michigan statutory scheme, in other words, gives each Michigan automobile owner "the choice whether to coordinate coverage on the no-fault side of his insurance," with a corresponding reduction in his no-fault policy premium. Smith v. Physicians Health Plan, Inc., 444 Mich. 743, 514 N.W.2d 150, 155 (1994).

Here, all are agreed that Mr. Shenkus made precisely this election, choosing a Citizens no-fault auto insurance policy that provided only excess coverage for medical expenses that were payable under a variety of other plans. If either he or Citizens had undertaken any research before entering into this policy, a review of the Plan's SPD would have indicated that the COB provision in the Citizens policy was effective to render the Plan's coverage primary, where none of the SPD's COB guidelines would dictate otherwise. To be sure, there is no evidence in this case that any such review was conducted prior to the issuance of the Citizens policy. Yet, regardless of any such indicia of actual detrimental reliance here, an insurer plainly ***could*** conduct such an inquiry, in order to more precisely tailor any premium reduction to the likelihood that a particular insured might be eligible for benefits from another source. Thus, it is incorrect to broadly assert, as the Plan does here, that a no-fault insurer in Citizens' position can never claim

24

the sort of reliance on an SPD that the Sixth Circuit cited as a factor in <u>Edwards</u> and

<u>Helwig</u>. Just as the Court in those cases declined to require a showing of detrimental

reliance, this Court deems such a showing unnecessary in this case.

Finally, the Court observes that the same result would obtain — *i.e.,* the SPD

would control over the conflicting terms of the underlying plan — under traditional rules

of contract construction. In particular, under "[t]he rules of contract interpretation that

have evolved under the federal common law in ERISA priority disputes," an insurer "has

a duty to express clearly the limitations in its policy," and "any ambiguity will be

construed liberally in favor of the insured and strictly against the insurer." <u>Citizens</u>

<u>Insurance</u>, 449 F.3d at 692 (internal quotation marks and citations omitted); <u>see also</u>

<u>Regents of University of Michigan</u>, 122 F.3d at 339-40; <u>Hansen v. Continental Insurance</u>

<u>Co.</u>, 940 F.2d 971, 982 (5th Cir. 1991) ("Any burden of uncertainty created by careless or

inaccurate drafting of the summary must be placed on those who do the drafting, and who

are most able to bear that burden.").[11] As the courts have recognized, a plan and its SPD

are properly viewed collectively as a single "contract." <u>See</u> <u>Burstein</u>, 334 F.3d at 381;

<u>Ross v. Rail Car America Group Disability Income Plan</u>, 285 F.3d 735, 739 & n. 5 (8th

Cir. 2002). Thus, "[i]f an SPD conflicts with a plan document, then a court should read

the terms of the 'contract' to include the terms of a plan document, as superseded and

---

[11]Although the Plan contends that this rule of *contra proferentem* applies only to plans
that are funded by insurance policies, as opposed to self-funded plans, the Sixth Circuit has
applied this rule in a case involving a self-funded plan, <u>see</u> <u>Citizens Insurance</u>, 449 F.3d at 690,
as well as in a second case where the Court did not deem it necessary to mention whether the
plan at issue was self-funded, <u>see</u> <u>Regents of University of Michigan</u>, 122 F.3d at 338.

25

modified by conflicting language in the SPD." Burstein, 334 F.3d at 381.  Applying these principles of contract interpretation in this case, the SPD's description of the guidelines that will govern coordination of benefits overrides the contrary exclusion that is found only in the underlying Plan, but is nowhere referenced (or even alluded to) in the SPD.

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion for

summary judgment is GRANTED.  IT IS FURTHER ORDERED that Defendant's

motion for summary judgment is DENIED.[12]


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  March 2, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 2, 2007, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

---

[12]With the Court having now resolved the parties' dispute concerning the proper
coordination of the coverage provided to Mr. Shenkus under the Citizens policy and the Plan,
there remains only the question of the precise amount of reimbursement to which Citizens is
entitled.  It is not clear whether the parties are in agreement as to this amount, or whether the
Plan disputes some portion of the reimbursement sought by Citizens.  If the former, the Court
requests that the parties jointly submit a stipulation within *fourteen (14) days* of the date of this
opinion and order, so that the Court may enter an appropriate judgment resolving this case.  If a
disagreement remains, Citizens should file and serve a statement of its position within *fourteen
(14) days* of the date of this opinion and order.  The Plan shall then file and serve any desired
statement in opposition to Citizens' position within *fourteen (14) days* after service of Citizens'
submission, and Citizens, in turn, may file and serve a reply in further support of its position
within *seven (7) days* after service of the Plan's submission.  Upon reviewing these submissions,
the Court will set the matter for hearing if necessary, and will proceed to resolve any remaining
disputes and enter an appropriate judgment.

27